UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

In Re:                                          Bankruptcy No. 12-30132
                                                Chapter 7
Rodney Alan Berger,

                        Debtor.
_____/
Gene W. Doeling, as Bankruptcy
Trustee for Rodney Alan Berger,

                Plaintiff,

        vs.                                     Adversary No. 12-07033

Rodney Alan Berger, Shirlene
Berger and Pauline Berger,

                        Defendants.
_____/

**MEMORANDUM AND ORDER**

I.      **INTRODUCTION**

        Debtor Rodney Alan Berger petitioned for relief under Chapter 7 of the Bankruptcy

Code on February 22, 2012.  On August 9, 2012, Gene W. Doeling, the Chapter 7 trustee

assigned to Debtor's case, filed an adversary complaint requesting that the Court deny

Debtor a discharge pursuant to 11 U.S.C. § 727(a)(2)(A) and (a)(4).  Specifically, the

Trustee alleges that Debtor made deliberate, material omissions from his bankruptcy

schedules and false oaths by failing to schedule all of his assets and by failing to disclose

transfers of his interest in real estate and minerals.  The Trustee also asserted a cause of

action under 11 U.S.C. § 548, seeking to recover property Debtor allegedly transferred to

his mother and former spouse.

1

On August 24, 2012, the Trustee filed an amended adversary complaint, adding a cause of action under 11 U.S.C. § 547 to those claims alleged in his original complaint. Similar to the cause of action he asserted under section 548, the Trustee alleged that mineral rights Debtor transferred to Defendant Shirlene Berger (Debtor's ex-wife) and real property transferred to Defendant Pauline Berger (Debtor's mother), were preferential transfers which he sought to avoid.

Debtor filed an answer to the amended complaint on September 24, 2012, denying the Trustee's allegations and arguing that he failed to state a cause of action upon which relief could be granted.

Defendants Shirlene Berger and Pauline Berger reached independent settlement agreements with the Trustee which resolved the Trustee's claims under sections 547 and 548 against these Defendants. The Court approved the settlement agreements on February 22, 2013, and May 3, 2013, respectively. In light of these agreements, the only causes of action before the Court are those seeking a denial of Debtor's discharge under section 727(a)(2)(A) and (a)(4).

The Trustee and Debtor tried this adversary proceeding on April 3, 2013. Both parties filed post-trial briefs. For the reasons provided below, the Court finds in favor of the Trustee and orders that Debtor Rodney Alan Berger is denied a discharge in bankruptcy.

## II. FINDINGS OF FACT

Debtor started contemplating filing a petition for bankruptcy relief in January 2012 because he could not pay his debts. He testified that he had difficulty paying debts as they became due since 2006 when he was injured and unable to work for four and a half

months.  Debtor explained that his financial situation has declined since then and several judgments have been entered against him.

Debtor filed his bankruptcy petition on February 22, 2012.  On his petition, Debtor indicated he formerly did business as B & B Sanitation (B & B), a septic, sewer and drain cleaning business.  Debtor testified that he ran B & B Sanitation until February 1, 2012, when he ceased operations due to financial difficulty.

In addition to his petition, Debtor filed bankruptcy schedules and a Statement of Financial Affairs.  He declared under penalty of perjury that these documents were true and correct to the best of his knowledge, information and belief.  Debtor testified that he read all of the information in these documents prior to signing the declarations.

The Trustee scheduled the meeting of creditors for March 23, 2012.  Debtor and his attorney[1] appeared at the meeting where Debtor took an oath to tell the truth.  At the meeting, he initially testified that there were no errors or omissions on his petition or other related documents and that his schedules identified all of his assets.  After inquiry by Robert Keogh, attorney for creditors Patrick and Rhonda Maher, Debtor stated he may have transferred his interest in mineral rights to Shirlene Berger and his interest in real property to Pauline Berger sometime within the year prior to petitioning for bankruptcy relief.  The Trustee continued Debtor's meeting of creditors to investigate these transactions.

On April 26, 2012, Debtor filed an amended Schedule B and an amended Schedule C.  In these amended schedules, Debtor added a $1,300 "Credit owed by George's Tire

---

[1] Edwin W.F. Dyer III served as Debtor's attorney during the preparation of his bankruptcy petition and during the meeting of creditors.  During the adversary proceeding, Thomas Murtha represented Debtor.

(approximate amount)" to Schedule B and claimed this sum as exempt on Schedule C. Debtor made no other revisions with his amended schedules and he filed no other amendments.

The Trustee alleges Debtor made various false oaths on his bankruptcy schedules and Statement of Financial Affairs by deliberately undervaluing or omitting assets and transfers that he made.  The facts relevant to each alleged omission follow.

### A.    Mineral Interest

In support of his allegation that Debtor failed to list mineral interests he owned on his bankruptcy schedules, the Trustee offered evidence that Debtor received an interest in minerals from Pauline Berger by quit claim mineral deed executed May 26, 2006, and recorded in Stark County, North Dakota, on May 31, 2006.  See Exh. T-3.  With the quit claim mineral deed, Pauline Berger granted a remainder interest to Debtor and his siblings and reserved a life estate during her natural life to all minerals in and under the following real property:

> Township 137 North, Range 96 West, Stark County, ND
> Section 5: Lots 2, 3, 4; SW1/4NE1/4; S1/2NW1/4; W1/2SW1/4; W1/2SE1/4
>
> Township 138 North, Range 96 West, Stark County, ND
> Section 32: S1/2SW1/4; SE1/4

Exh. T-3.  Debtor did not list his remainder interest in minerals on his schedules or disclose it at the meeting of creditors.

Debtor did not dispute that the quit claim deed is genuine, that it was recorded or that he neglected to disclose it on his schedules.  At trial, he explained that he was not aware he owned a remainder interest in minerals until the week prior to the trial in this

4

adversary proceeding.  Debtor maintains that he has never received any royalties from this interest and did not receive a copy of the deed.

### B.    Personal Property

####    1.    Cash On Hand

On both the original and amended Schedule B, Debtor disclosed that he possessed $3.00 in cash on February 22, 2012, the date he filed his bankruptcy petition.  See Exhs. T-1, T-2.  Debtor initially testified he had no other cash on this date.

When questioning Debtor at trial, the Trustee suggested that Debtor possessed more than $3.00 when he filed his bankruptcy petition by highlighting the fact that Debtor deposited $500 into his personal checking account on February 27, 2012, five days after he petitioned for bankruptcy relief.  See Exh. T-13.

When first asked about the $500 deposit, Debtor testified that he was not working or collecting income at the time of petition and that the money he deposited on February 27, 2012, most likely came from B & B's checking account because it was still open at that time.[2]  According to Debtor's schedules, only $87.57 was on deposit in B & B's checking account on the date of petition.  See Exh. T-1.  This sum did not change when Debtor amended Schedule B.  See Exh. T-2.  When confronted with the discrepancy between Debtor's testimony that the $500 came from B & B and his representation on Schedule B that the balance of the B & B account was only $87.57 on the date of the petition, Debtor confessed that he was not sure of the source of the $500 deposit.  He speculated that his

---

[2] Debtor testified that he held two bank accounts at Dakota Community Bank on the date he filed his bankruptcy petition.  One he used as a personal checking account and the other he used as a business checking account for B & B.  Debtor maintained that all the income from B & B was deposited in the business checking account.

girlfriend might have loaned the money to him.

Debtor later recalled that the $500 deposit came from the sale of a truck he used for work.  On February 1, 2012, three weeks prior to petitioning for bankruptcy relief, Debtor sold a 1990 International Series 4900 truck for $12,500.[3]  At the meeting of creditors on March 23, 2012, Debtor told the Trustee about this sale, but testified that he spent all of the sale proceeds prior to filing his bankruptcy petition.  After the meeting of creditors, Debtor provided a written itemization of how the sale proceeds were spent to his attorney, who forwarded the list to the Trustee.  See Exh. T-10.  The itemization was dated April 2, 2012. Id.  It showed that Debtor used the sale proceeds to purchase a vehicle; transfer money to his son for his wedding; pay for a pickup repair; reimburse his girlfriend (Teresa Rohwedder) for unpaid living expenses; and pay for gas, groceries, medical and legal bills and other everyday expenses.  At trial, Debtor admitted that he had not spent all of the sale proceeds by February 22, 2012; rather, he still possessed at least $500 in cash on the date he filed his petition.

    2.   New Bed

Next to item 4 on Schedule B, which invites Debtor to list household goods and furnishings, Debtor listed only a refrigerator, stove, microwave and dishwasher.[4]  Through the examination of Debtor, the Trustee offered evidence that Debtor purchased a bed for

---

[3] On his Statement of Financial Affairs, Debtor disclosed that he sold a 1990 International truck for $4,900.  See Exh. T-1.  However, Debtor testified during both the meeting of creditors and at trial that he sold the truck for $12,500.  Debtor explained that the Statement of Financial Affairs incorrectly recorded the series of the truck (4900) as the sale price.  Debtor claimed he did not notice the mistaken reference to the series number as the sale price until the Trustee brought this issue to his attention.

[4] He claimed these appliances exempt on Schedule C.  See Exh. T-2.

approximately $900 three months prior to filing his bankruptcy petition. Debtor did not list

a bed on his original or amended Schedule B. <u>See</u> Exhs. T-1, T-2. Debtor still owns the

bed.

Debtor testified that he did not list the bed because he believed it was unnecessary

to do so. He explained that conversations with his attorney led him to believe the bed was

exempt from his bankruptcy estate, so he did not include it on his schedules.

### 3.    Accounts Receivable

On his original Schedule B, Debtor listed approximately $250 as the accounts

receivable owed to B & B. <u>See</u> Exh. T-1. This amount remained the same on his amended

Schedule B; however, Debtor added a credit owed by George's Tire in the approximate

amount of $1,300 next to "other liquidated debts owed to debtor." <u>See</u> Exh. T-2.

During the meeting of creditors, Debtor testified that the $250 listed next to

"accounts receivable" on Schedule B was the debt owed on only one account. When

questioned at trial about accounts receivable, Debtor admitted that three or four different

customers owed B & B money on the date he filed his petition and that the amount

recorded next to accounts receivable on Schedule B was not accurate. Debtor maintained

that he gave information about the undisclosed accounts to the attorney who prepared his

schedules.

At trial, Debtor testified that he was unsure of the total amount of accounts

receivable owed to B & B at the time he petitioned for bankruptcy. Bank statements

received into evidence show that not less than $937.45 was deposited into the B & B

checking account from four different customers for services Debtor conceded were

performed by B & B in January 2012. <u>See</u> Exh. T-14.[5] These deposits were all made after

Debtor filed his petition but prior to the date he filed his amended Schedule B on April 26,

2012. Debtor did not revise the accounts receivable total to reflect a more accurate

amount, despite receiving payments on these accounts before amending his schedules.

Nevertheless, he amended his schedules to reflect a debt owed by an entirely different

customer. On his amended Schedule B, Debtor listed a credit of $1,300 owed by George's

Tire as "other liquidated debt owed to debtor." Debtor explained that George's Tire was

one of the three or four customers he believed owed money to B & B on the date he

petitioned for bankruptcy relief.

Additionally, Debtor failed to list a prepetition judgment debt on his schedules. On

August 3, 2012, Debtor deposited $1,000 he collected pursuant to a district court judgment

into his personal checking account. <u>See</u> Exh. T-13. Debtor explained that he did not

include this debt in the accounts receivable total on Schedule B because he had written it

off.

       4.   <u>Tools</u>

In the Final Pretrial Statement and Amended Final Pretrial Statement, Debtor and

the Trustee agreed that the following statement may be accepted as established fact for

---

[5] Debtor deposited the following checks the month before he filed his bankruptcy
petition. Debtor testified that these checks were payments for services performed by
B & B in January 2012.

| Customer | Date of Deposit | Deposit Amount | Exhibit |
|----------|-----------------|----------------|---------|
| Champion | 3/24/12 | $425.00 | 14, p. 383 |
| Sax Motor Co | 3/19/12 | $125.00 | 14, p. 383 |
| Sanfords | 4/21/12 | $125.00 | 14, p. 385 |
| Consolidated | 4/17/12 | $112.45 | 14, p. 385 |
| Champion | 4/3/12 | <u>$150.00</u> | 14, p. 385 |
| TOTAL | | $937.45 | |

the purpose of this case:

> The debtor did not disclose in his bankruptcy schedules tools owned by him with an estimated value of $1,000.

<u>See</u> ECF Doc. Nos. 45, 46, 50, 57.

When questioned about the tools at trial, Debtor admitted that he stored tools in a storage unit that he rented for more than a year prior to filing. Debtor did not list the tools on either his original or amended Schedule B. Likewise, he did not disclose the $85 monthly expense for the storage unit on Schedule J. <u>See</u> Exh. T-1, T-2.

To explain the omissions, Debtor initially testified he did not think about the tools when he petitioned. Later, he stated that he gave the information about the tools to his attorney, who reportedly did not include them in the schedules. Debtor then offered the alternative explanation that the tools had little value, that he owned them for more than thirty years and that he assumed they would be exempt, like the bed. He stated that his attorney did not inform him that it was necessary to separately list the items to claim them as exempt.

In response to questions regarding his omission of the monthly expense for the storage unit, Debtor explained that he believed it was unnecessary to list this expense. Debtor listed other monthly expenses on Schedule J, however. <u>See</u> Exh. T-1.

### C.   Income

#### 1.   <u>Checks from Big John's Portable Toilet Service and Affiliated Companies</u>

At trial, the Trustee argued that Debtor failed to include correct income figures on Schedule I. Specifically, the Trustee claims that Debtor receives rental income from his home located in Dickinson, North Dakota.

9

Prior to 2009, Debtor and his wife at the time, Shirlene Berger, lived in a house located at 893 22nd Street West, Dickinson, North Dakota (Dickinson Home). Both Debtor and Shirlene Berger moved out of the Dickinson Home by the beginning of 2009. On September 9, 2009, Debtor and Shirlene Berger divorced. See Exh. T-9. Pursuant to their divorce decree, the couple planned to sell the Dickinson Home and divide the sale proceeds equally between them. Id.

As of the date of trial, the Dickinson Home had not been sold. The house was listed with a real estate agent, but Debtor claimed there was too much "red tape" for it to sell. In his schedules, Debtor listed the value of the Dickinson Home as $165,000 and the secured claim against it as $160,141.05. See Exh. T-1. He stated the Dickinson Home is currently in foreclosure.

After Debtor moved out of the Dickinson Home in late 2008, he used the home for storage. He allowed friends to stay there to prevent squatters from moving into the house and to keep the property secure. In the year prior to filing his bankruptcy petition, Jeff Peltier, Stacy Birk and Jerry Carlson lived in the Dickinson Home. Jon Peltier also stayed in the house on occasion. According to Debtor, they did not pay rent. Debtor initially testified that they paid the utilities, but later he stated that he paid the utilities. No one paid the mortgage, insurance or taxes on the Dickinson Home. Debtor explained Jeff Peltier did not pay rent because they had an arrangement that would benefit Debtor in the future. This arrangement included the understanding that when Jeff Peltier's business grew, he would make Debtor his employee or business partner. Debtor did not explain why Stacy Birk, Jerry Carlson or Jon Peltier did not pay rent at that time.

10

After petitioning for bankruptcy relief, Debtor requested that Jeff Peltier and Stacy Birk pay rent. Debtor testified that Jeff Peltier agreed to pay $1,000 per month and Stacy Birk agreed to pay $500 per month.

Jeff Peltier made his first rent payment on April 30, 2012, by providing funds through his company, Big John's Portable Toilet Service. See Exh. T-13. Debtor explained that Jeff Peltier started paying rent because their business arrangement did not materialize; Jeff Peltier did not employ Debtor or enter into a partnership agreement with Debtor.

Stacy Birk's first rent payment was due on April 1, 2012. See Exh. T-12. According to Debtor, Stacy Birk failed to make her June 2012 rent payment, and she owed him $2,000 for rent and other expenses. He filed a complaint against her seeking to collect the debt she owed and to evict her from the Dickinson Home. Id.

Debtor maintains he was not receiving rental income from any individual living in the Dickinson Home prior to filing his bankruptcy petition. The Trustee offered evidence that Debtor routinely deposited checks from Jeff Peltier's business (which employed Jon Peltier) into his personal checking account and suggested that these checks represent rent payments. The Trustee highlighted the following deposits:

|    | Date of Deposit | Source of Funds | Amount of Deposit |
|----|-----------------|-----------------|-------------------|
| 1. | 2/16/2011 | Big John | $683.61 |
| 2. | 4/28/2011 | Big John | $650.11 |
| 3. | 5/27/2011 | Big John | $1,300.21 |
| 4. | 6/29/2011 | Big John | $582.45 |
| 5. | 6/30/2011 | Big John | $2,132.70 |
| 6. | 7/12/2011 | Big John | $829.50 |
| 7. | 9/26/2011 | Byers | $259.75 |
| 8. | 11/14/2011 | Big John | $1,026.37 |
| 9. | 1/26/2012 | Dirt Pro | $800.00 |

See Exh. T-13.

11

Debtor testified these deposits were not rent payments.  Debtor explained that he deposited the paychecks Jon Peltier received from his employer[6] into Debtor's personal account and then promptly withdrew these funds and gave them to Jon Peltier.  Debtor claims that he agreed to cash Jon Peltier's paychecks for him because Jon Peltier did not have a checking account of his own.[7]

### 2.    Checks from Jerry Carlson or His Employer

Although Debtor initially testified that no one else made arrangements with him to cash paychecks, he later testified that he cashed paychecks for Jerry Carlson, who also lived in the Dickinson Home.  On June 28, 2012, and June 30, 2012, Debtor deposited checks totaling $3,371.63, which he claims were Jerry Carlson's paychecks.  See Exh. T-

---

[6] Jon Peltier was employed by Big John's Portable Toilet Service. Dirt Pro and Byers are entities affiliated with Big John's Portable Toilet Service,  which issued checks to Jon Peltier as well.

[7] Each of the deposits highlighted by the Trustee appears to have a corresponding check written to the order of "Cash" or "Rod Berger" for a similar amount.

1.    Check to the order of Cash on 2/19/2011 for $300 and check to the order of Cash on 2/26/2011 for $400
2.    Check to the order of Rod Berger on 4/28/2011 for $650
3.    Check to the order of Cash on 5/28/2011 for $1,300.20
4.    Check to the order of Rod Berger on 6/29/2011 for $582.45
5.    Check to the order of Rod Berger on 6/30/2011 for $2,132.70
6.    Check to the order of Cash on 7/12/2011 for $829.50
7.    Check to the order of Cash on 10/8/2011 for $300.00
8.    Check to the order of Cash on 11/22/2011 for $150.00, check to the order of Rod Berger on 11/23/2011 for $600.00 and check to the order of Cash on 11/26/2011 for $300.00
9.    Check to the order of Cash on 2/3/2012 for $400

See Exh. T-13.  In addition to the deposits specifically highlighted by the Trustee, there are other instances in which Debtor withdrew funds by writing checks to "Cash" or "Rod Berger" shortly after depositing a check from Big John's into his personal checking account.  Id.  On May 2, 2011, for example, a deposit slip indicates the depositor was Big John's (Jon Peltier), and Debtor issued a check to the order of Cash for the same amount on the same day.  Id.

13. After depositing the checks, Debtor testified that he gave cash to Jerry Carlson for the paycheck amounts. Checking account records received as evidence show seven checks totaling approximately $3,100 written to the order of "Cash" or "Rod Berger" on June 30, 2012, July 3, 2012 (two checks), July 27, 2012, August 3, 2012, October 26, 2012, and November 23, 2012.

### 3. Income Recorded on Schedule I

Debtor testified during the meeting of creditors and at trial that he was not receiving income at the time he filed his bankruptcy petition because he had ceased operating B & B. Despite this representation, Schedule I reflects that Debtor was earning $6,007.23 in monthly income from the operation of his business. See Exh. T-1.

Debtor testified that this figure was inaccurate and that it should have been zero. He explained that the $6,007.23 figure was the net income he earned in 2011. Debtor's 2011 tax return shows net business income for 2011 of $6,442.00.[8] See Exh. T-11.

### D.   Transfers

#### 1.   Transfer of Real Property to Pauline Berger

In March 2011, Debtor transferred his interest in a parcel of real property to his mother, Pauline Berger. According to a quit claim deed received as evidence at trial, Debtor and his siblings transferred all of their rights, titles, interests, claims or demands in

---

[8] Debtor's 2011 IRS schedule C, form 1040, shows his total gross income as $68,611.00. See Exh. T-11. To arrive at the net income figure, Debtor deducted numerous business expenses, including a depreciation expense of $16,723.00. Id. Based on the evidence received at trial, it is not clear when Debtor disposed of the equipment listed on the depreciation schedule (other than the 1990 International truck which he sold three weeks before filing his bankruptcy petition), but Debtor maintains that all the equipment was "long gone" before he filed for bankruptcy relief. Debtor's Statement of Financial Affairs lists his 2011 income as $35,203.01, and Debtor testified he believed this number was accurate.

Lot Twelve (12), Block Twenty-four (24), Heart River 4th Addition to the City of Dickinson, Stark County, North Dakota, to Pauline Berger.   See Exh. T-5; Am. Final Pretrial Statement, ECF Doc. No. 57, at 3, ¶ 6.B.  Debtor signed and dated the quit claim deed on March 24, 2011.  Id.  The Stark County, North Dakota, Recorder's Office recorded it on the same day.  Id.  Debtor did not disclose the transfer on his Statement of Financial Affairs.

At the meeting of creditors, Debtor did not initially disclose this transfer.  When the Trustee asked Debtor whether he transferred any property, Debtor replied "no."  Debtor disclosed the real property transfer to his mother only after Robert Keogh, the attorney for Patrick and Rhonda Maher (who are listed as creditors on Debtor's Schedule F), specifically inquired about the transfer.  In response to Attorney Keogh's inquiry, Debtor explained that Pauline Berger had originally deeded the property to Debtor and his three siblings as a gift.[9]  Debtor then added that he agreed to transfer the property back to Pauline Berger because he owed her money and was not going to pay her.[10]  Debtor explained that he did not disclose this transfer on his Statement of Financial Affairs because he had forgotten about it and did not believe it was relevant to his bankruptcy petition.  The Trustee did not learn about this transfer until the meeting of creditors.

---

[9] Pauline Berger granted the property to herself and her children in joint tenancy on October 16, 2000.  See Exh. T-18.  Debtor signed the quit claim deed.  Id.  Debtor testified, however, that he did not remember signing the deed.  Prior to establishing the joint tenancy, Debtor explained that Pauline Berger transferred and received the property a number of times through several transactions as a part of her estate planning.  See Exhs. D-1, D-2.

[10] Debtor testified that his schedules do not accurately reflect debt he owes to his mother.  On Schedule F, Debtor listed Pauline Berger as a creditor with $0.00 as the amount of her claim.  During the meeting of creditors and at trial, Debtor testified that he actually owes Pauline Berger in excess of $100,000.  Debtor explained that he was unsure of the amount when he petitioned for bankruptcy, but he believed it was in excess of $100,000.

14

At trial, Debtor testified that he did not include the transfer to Pauline Berger because he never considered the property to be his. He did not believe that he had transferred something that he owned or was entitled to receive. He stated that he did not intend to deceive anyone by engaging in this transaction. He explained that he merely took his name off Pauline Berger's documents by signing the quit claim deed because she wanted his name removed from her property because he owed her money. Debtor testified, however, that he did not expect to have his debt to Pauline Berger forgiven by signing the quit claim deed.[11] Debtor did not receive any compensation for this transfer. Am. Final Pretrial Statement, ECF Doc. No. 57, at 3, ¶ 6.B.

In his post-trial brief, Debtor "admits there was a deed in 2011 by which the debtor transferred whatever interest he had in a residential house in Dickinson." See Br., ECF Doc. No. 65, at 2. He maintains, however, that he received reasonably equivalent value in exchange for the transfer because he received nothing in exchange for an interest that had no value. Id. at 3.

Debtor did not file an amended Statement of Financial Affairs acknowledging this transaction even though the Trustee discussed its potential impact on the bankruptcy estate at the meeting of creditors.

2.    <u>Transfer of Mineral Interest to Shirlene Berger</u>

By executing and delivering a mineral deed, Debtor transferred to Shirlene Berger all of his right, title and interest in and to all minerals of every kind and nature in the following real property in Stark County, North Dakota:

---

[11] Pauline Berger later sold the real property for $275,000. See Exh. T-6. Debtor did not receive any of the proceeds.

Township 138 North, Range 94 West
Section 23: W2
Section 26: NW4

Exh. T-7; Am. Final Pretrial Statement, ECF Doc. No. 57, at 3, ¶ 6.C.  Debtor signed the mineral deed on March 10, 2011, and the Stark County, North Dakota, Recorder's Office recorded it on March 14, 2011.  Exh. T-7.  Debtor did not disclose this transfer on his Statement of Financial Affairs.  Like the transfer of real property from Debtor to Pauline Berger, the Trustee did not learn about this transaction until the meeting of creditors.

At the meeting of creditors, Debtor did not initially disclose this transfer.  After Attorney Keogh inquired about the transfer to Debtor's mother, Debtor recalled this transfer to Shirlene Berger, and disclosed it as well.  He explained that Shirlene Berger's relatives deeded this property to Shirlene Berger and Debtor, and Shirlene Berger asked Debtor to remove his name from the property.

At trial, Debtor explained that he did not list this transfer on his Statement of Financial Affairs because he did not believe that he owned an interest in this property when he made the transfer.  Debtor testified that when he and Shirlene Berger were divorced, "what was hers was hers, and what was mine was mine."  Although Debtor and Shirlene Berger were unaware of this property at the time of divorce,[12] Debtor testified that he transferred his interest to Shirlene Berger after the divorce because it originated from her family.  See Exh. T-8.  According to Debtor, he merely removed his name from Shirlene Berger's property.  Debtor noted that he had not seen the mineral deed granting an interest to him prior to filing for bankruptcy relief.

---

[12] The mineral interests were not listed in their divorce decree because they were unaware of the mineral deed at the time.  See Exh. T-9.

Debtor testified that he was not trying to hide anything by omitting this transfer on his Statement of Financial Affairs because he believed he was not forfeiting any of his property.  He explained he did not discuss this transaction with his attorney because it did not come to mind and because he did not think it was relevant.  Debtor did not file an amended Statement of Financial Affairs disclosing this transfer.

       3.       <u>Transfer of $1,200 to Justin Berger</u>

In the Final Pretrial Statement and Amended Final Pretrial Statement, Debtor and the Trustee agreed that the following statement may be accepted as established fact for the purpose of this case:

> Rodney Berger gifted the sum of $1,200 to his son Justin for Justin's upcoming wedding within 30 days before the debtor filed bankruptcy.  This gift was not disclosed in the debtor's bankruptcy schedules.

<u>See</u> Final and Am. Final Pretrial Statement, ECF Doc. Nos. 45, 46, 50, 57.

Despite his admission in the Amended Final Pretrial Statement, Debtor objected to the Trustee's characterization of the $1,200 transfer as a gift.  Debtor testified he did not disclose this transfer because he did not believe it was a gift to his son.  Rather, he referred to the transfer as an obligation to his family; an obligation as a parent to provide money to his son for his wedding.  He added that he was not trying to be deceptive by not listing this transfer.

Debtor did not owe Justin Berger money at the time of the transfer.  Justin Berger was not listed as a creditor on Schedule F.

Although the parties characterize the transfer differently, Debtor conceded that he transferred money to his son within 22 days before he filed his petition.  Specifically, Debtor testified that he transferred $1,200 in proceeds from the February 1, 2012, sale of the 1990

17

International Series 4900 truck to his son for his upcoming wedding.    Debtor neither disclosed this transfer in his Statement of Financial Affairs nor during the meeting of creditors.  The Trustee became aware of the transfer after Debtor provided a list of sale proceeds expenditures dated April 2, 2012. See Exh. T-10.  On the itemization of sale proceeds expenditures, Debtor characterized the transfer to his son, Justin, as a "loan." Id.  Justin Berger did not sign a promissory note or agree to repay Debtor.

### 4.    Transfers or Payments to Creditors

At trial, Debtor confirmed that his Statement of Financial Affairs does not include payments he made to his girlfriend for living expenses or funds he spent to repair the vehicle his daughter drives.  During the meeting of creditors, Debtor testified that he considered his girlfriend, Teresa Rohwedder, to be one of his creditors.  He explained that he lived with Rohwedder in her condominium and she asked that he pay $349 per month for rent.  He admitted that he did not consistently make these payments and that he had missed payments in the months prior to filing his bankruptcy petition.  Debtor gave some of the proceeds from the February 1, 2012, sale of the 1990 International truck to Rohwedder.  During the meeting of creditors, Debtor testified he used at least $2,000 or $3,000 of the sale proceeds to pay Rohwedder.  In the sale proceeds itemization letter he prepared and sent to his attorney, Debtor represented that he gave Rohwedder only $700, but indicated that he still owed her living expenses incurred in "previous months." See Exh. T-10.  Debtor testified he did not list Rohwedder as a creditor in his schedules because he believed it was unnecessary to list her.  Debtor did not list the transfers or payments to Rohwedder on his Statement of Financial Affairs.  See Exh. T-1.

18

Debtor's Statement of Financial Affairs is also devoid of any reference to the repair bill he paid on behalf of his daughter a month before he filed his bankruptcy petition. At trial, Debtor testified that he paid $673.77 for repairs to a 2004 Oldsmobile Alero titled in his name, his daughter's name and his former spouse's name. Debtor explained that the 2004 Oldsmobile was his daughter's car, but she could not afford to pay the repair bill so he paid it for her.

Debtor's schedules reflect that he owns an interest in the 2004 Oldsmobile and that he owes a debt to One Main Financial that is secured by this vehicle. See Exh. T-1; Schedules B & C, Statement of Fin. Affairs, ECF Doc. No. 1, at 21, 24, 37. Debtor's Statement of Financial Affairs reflects that he made a payment to One Main Financial within 90 days preceding the commencement of this case, but Debtor did not list the money he spent for repair services as a payment to a creditor made within 90 days of filing his petition on his Statement of Financial Affairs. Likewise, the $673.77 payment is not listed as a gift or transfer on Debtor's Statement of Financial Affairs.

## III.   CONCLUSIONS OF LAW

### A.   Jurisdiction

The parties agree that this Court has jurisdiction over the adversary proceeding and that this is a core proceeding. Neither party disputes that this Court has authority to enter a final order in this case. The Court finds that it has jurisdiction under 28 U.S.C. §§ 1334 and 157 and that it has authority to enter a final order in this matter. This opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

19

### B.    11 U.S.C. § 727

In his complaint, the Trustee argues Debtor should be denied a discharge pursuant to 11 U.S.C. § 727(a)(2)(A) and (a)(4).  Denying a debtor a discharge is a harsh remedy. Kaler v. Charles (In re Charles), 474 B.R. 680, 683 (B.A.P. 8th Cir. 2012); Allred v. Vilhauer (In re Vilhauer), 458 B.R. 511, 514 (B.A.P. 8th Cir. 2011).  Therefore, section 727 is strictly construed in favor of the debtor.  In re Vilhauer, 458 B.R. at 514.  Notwithstanding, a discharge in bankruptcy and the associated fresh start are privileges, not rights.  Bauer v. Iannacone (In re Bauer), 298 B.R. 353, 357 (B.A.P. 8th Cir. 2003) (citing Grogan v. Garner, 498 U.S. 279, 286 (1991)).  "The opportunity for a completely unencumbered new beginning is limited to the honest but unfortunate debtor."  In re Bauer, 298 B.R. at 357. The cost to the debtor for an unencumbered fresh start is minimal, but it includes honesty and accurately disclosing his or her financial affairs and cooperating with the trustee.  Id.; see also 11 U.S.C. § 521 (listing a debtor's duties in bankruptcy).  "To prevail in an action to deny a debtor's discharge, the objecting party must prove each element under § 727 by a preponderance of the evidence."  In re Charles, 474 B.R. at 683-84 (citing In re Vilhauer, 458 B.R. at 514; Fed. R. Bankr. P. 4005).

### 1.    11 U.S.C. § 727(a)(4)(A)

Section 727(a)(4)(A) bars the entry of discharge if a "debtor knowingly and fraudulently, in or in connection with a case, made a false oath or account."  11 U.S.C. § 727(a)(4)(A).  To meet his burden under this subparagraph, the Trustee must prove that "'(1) Debtor made a statement under oath; (2) the statement was false; (3) Debtor knew the statement was false; (4) Debtor made the statement with fraudulent intent; and (5) the

20

statement related materially to Debtor's bankruptcy case.'" <u>Lincoln Sav. Bank v. Freese</u> (<u>In re Freese</u>), 460 B.R. 733, 738 (B.A.P. 8th Cir. 2011) (citations omitted).

The Bankruptcy Code, through section 727(a)(4)(A), "'requires nothing less than a full and complete disclosure of any and all apparent interests of any kind.'" <u>Korte v. U.S. Internal Revenue Serv.</u> (<u>In re Korte</u>), 262 B.R. 464, 474 (B.A.P. 8th Cir. 2001) (quoting <u>Fokkena v. Tripp</u> (<u>In re Tripp</u>), 224 B.R. 95, 98 (Bankr. N.D. Iowa 1998)).   The proper functioning of the entire bankruptcy process is dependent upon debtors providing complete, accurate and reliable information on the petition and other documents filed with the court so that parties in interest may evaluate debtors' assets and liabilities and appropriately administer the case.   <u>Jordan v. Bren</u> (<u>In re Bren</u>), 303 B.R. 610, 613-16 (B.A.P. 8th Cir. 2004) (overruled on other grounds).   Section 727(a)(4)(A) promotes veracity in the statements and schedules to help prevent creditors and the trustee from having to resort to independent fact-finding and investigation.   <u>Daniel v. Boyd</u> (<u>In re Boyd</u>), 347 B.R. 349, 354 (Bankr. W.D. Ark. 2006).   The disclosure requirement has implications beyond the administration of each individual bankruptcy case.   "The failure to comply with the requirements of disclosure and veracity necessarily affects the creditors, the application of the Bankruptcy Code, and the public's respect for the bankruptcy system as well as the judicial system as a whole."   <u>See</u> <u>Nat'l Am. Ins. Co. v. Guajardo</u> (<u>In re Guajardo</u>), 215 B.R. 739, 742 (Bankr. W.D. Ark. 1997).   "The debtor's duty of disclosure requires updating schedules as soon as reasonably practical after he or she becomes aware of any inaccuracies or omissions."   <u>In re Bauer</u>, 298 B.R. at 357.

The Trustee argues Debtor made multiple false oaths in his bankruptcy filings. Specifically, the Trustee alleges Debtor undervalued the income he received from renting

his home, accounts receivable owed to his business and the amount of cash he possessed. The Trustee also claims Debtor failed to disclose that he owned a new bed and used tools, paid a car repair bill for his daughter, owned an interest in minerals and transferred assets to his mother, former spouse and son.

### a.    Statement Under Oath

To prevail on this claim, the Trustee must first prove that Debtor made a statement under oath.  See In re Freese, 460 B.R. at 738.  This element is satisfied.  Debtor signed his bankruptcy petition and various certifications and declarations accompanying his petition, schedules and Statement of Financial Affairs, swearing that these documents were true and accurate.  A debtor's signature on the petition, made under penalty of perjury, is a declaration that has the force and effect of an oath of the kind encompassed by section 727(a)(4)(A).  In re Bren, 303 B.R. at 613; Cepelak v. Sears (In re Sears), 246 B.R. 341, 347 (B.A.P. 8th Cir. 2000).  Debtor reaffirmed his representations that there were no errors or omissions on his petition or other related documents at the meeting of creditors after he took an oath to tell the truth.  Accordingly, the Court finds that Debtor's representations in (and omissions from) his schedules and Statement of Financial Affairs as well as his testimony during the meeting of creditors are "statements under oath" within the meaning of section 727(a)(4)(A).

### b.    False Statement Debtor Knew Was False

The Trustee also satisfied the second and third elements of his claim under section 727(a)(4)(A).  The schedules Debtor filed on February 22, 2012, and amended on April 26, 2012, are not accurate.  Debtor did not disclose his interest in minerals, the new bed he purchased for over $900 several months before filing or his used tools valued at $1,000.

22

Likewise, Debtor's schedules do not accurately reflect that Debtor possessed over $500 rather than $3 in cash or that the total accounts receivable due to B & B was over $3,000[13] rather than approximately $250 on the date of petition.   Although Debtor amended Schedules B and C to reflect the $1,300 payment he expected to receive from George's Tire, Debtor did not amend his schedules to include the funds he received from other customers, to disclose the judgment debtor who later paid his or her debt, to accurately reflect cash on hand or to add the other assets he omitted.

Debtor acknowledged that he knew he possessed more than $500 on the date of the petition and he admitted he knew that more than one customer owed B & B money when he filed his petition.   Debtor also admitted that he purchased a new bed in November 2011 and testified that he still owns the bed.   Similarly, he  acknowledged that he owned the tools on the date he filed his bankruptcy petition.   This evidence is sufficient to show that Debtor knew he omitted the bed and tools and undervalued cash on hand and accounts receivable on his schedules.   Debtor's knowledge of his interest in minerals is less clear.

Debtor denied that he knew about his interest in minerals until a week before the trial in this case.   In support of his claim that Debtor knew about the mineral interests, the Trustee offered evidence that the mineral deed transferring a remainder interest in minerals to Debtor and his siblings was signed by Pauline Berger on May 26, 2006, and recorded in Stark County, North Dakota, on May 31, 2006.   Debtor argues that the interest transferred by this deed did not vest because the deed was never "delivered" to Debtor.

---

[13] This sum includes $937.45 Debtor received from customers during March and April 2012, $1,000 Debtor received from a judgment debtor in August 2012 and $1,300 owed by George's Tire Debtor disclosed on his amended schedules.

Based on this legal premise, Debtor argues that the deed is void and he did not hold an interest in the minerals at the time he filed his bankruptcy petition.

Debtor is correct that under North Dakota law an interest transferred by a deed does not vest until there is delivery of the deed. See N.D.C.C. § 47-09-06. "Absent a delivery of the deed, the deed is of no effect." Jorgensen v. Crow, 466 N.W.2d 120, 122 (N.D. 1991) (citation omitted). It is also true, however, that the "recording of a deed may create a rebuttable presumption of its delivery to, and its acceptance by the grantee." Id. (citing CUNA Mortgage v. Aafedt, 459 N.W.2d 801, 804 (N.D. 1990)).

At trial, Debtor testified that there were a number of transactions between Pauline Berger and her children involving the transfer of interests in real property and he made comments suggesting he did not diligently keep track of them all. Debtor also acknowledged that he reviewed the mineral deed a week before trial and recognized it at trial; he did not dispute that the deed was genuine or that it was properly recorded. Based on this testimony and other evidence received at trial, and in light of the lack of evidence that the transfer of mineral interests to Debtor was burdensome, the Court finds that the recording of the mineral deed created a rebuttable presumption of the deed's delivery to, and its acceptance by, Debtor. See CUNA Mortgage, 459 N.W.2d at 804 (citation omitted) ("A failure to renounce a deed after knowledge of its existence may also in some circumstances be sufficient to show that a grantee accepted the deed.").

Having concluded that a rebuttable presumption arose in this case, the next question is whether Debtor rebutted this presumption. The presumption that the deed was delivered and accepted by Debtor must be rebutted with "clear and convincing evidence." Jorgensen, 466 N.W.2d at 122. The only evidence offered by Debtor to rebut the

24

presumption that the mineral deed was delivered and that Debtor accepted it was his testimony that he did not receive royalty payments and did not know about the mineral deed until shortly before trial.  Given the numerous transactions between Pauline Berger and Debtor and his siblings and Debtor's admitted failure to fully disclose his interest in other assets, the Court finds that his testimony on this issue is suspect.  Debtor's testimony, without more, is not sufficient to meet the clear and convincing standard.  Consequently, the quit claim mineral deed is not void.  Debtor owned an interest in minerals on the date he filed his petition which he failed to disclose in his schedules.  Accordingly, the Court finds that Debtor's omission of the mineral interests on Schedule B was a false statement.

The conclusion that Debtor owned an interest in minerals he failed to disclose does not resolve the third element of the Trustee's section 727(a)(4) cause of action, however. Debtor's failure to meet the clear and convincing standard necessary to rebut the presumption that he accepted the mineral deed does not mean that the Trustee met his burden of proving that Debtor knew that he owned an interest in minerals on the date of petition.  The only support for the Trustee's argument is evidence suggesting that there were numerous estate-planning transactions between Pauline Berger and Debtor and his siblings, the recorded deed and Debtor's admitted failure to fully disclose his interest in other assets.  After reviewing this evidence and Debtor's trial testimony, the Court finds that the Trustee has not met his burden of proving that Debtor knew that he owned an interest in minerals transferred to him by his mother in May 2006.  As to this asset, the Trustee has not met his burden of proving the third element of his section 727(a)(4) cause of action. Naturally, the Trustee's inability to meet his burden of proof with regard to his claim that

25

Debtor knowingly failed to disclose mineral interests does not mitigate Debtor's failure to disclose other assets on his schedules and statements.

In addition to the omissions on his schedules, Debtor's Statement of Financial Affairs does not reflect payments he made to his girlfriend for rent and living expenses or the money he spent a month before filing his bankruptcy petition to repair the vehicle his daughter drives. Similarly, his Statement of Financial Affairs does not disclose the transfer of cash to Debtor's son, mineral rights to Debtor's former spouse and real estate to Debtor's mother. At trial and during the meeting of creditors, Debtor admitted that he knew about these payments and asset transfers on the date his bankruptcy case was commenced, but did not disclose them in his Statement of Financial Affairs.

Accordingly, the Court finds that, except for his allegations regarding Debtor's interest in minerals transferred to him in May 2006, the Trustee satisfied his burden of proving that Debtor omitted information and made false statements under oath that he knew were false on the date he signed the petition. See In re Korte, 262 B.R. at 474 (finding that debtor's omissions and misstatements on schedules and during testimony at the meeting of creditors were false statements under oath that the debtor knew were false under section 727(a)(4)(A)); In re Freese, 460 B.R. at 738-39 (finding that intentionally omitting assets from bankruptcy schedules is a false oath under section 727(a)(4)).[14]

---

[14] In addition to the omissions outlined above, the Trustee argues that Debtor failed to disclose prepetition income he generated from leasing his house. Through testimony from Debtor, the Trustee showed that Jeff Peltier, Stacy Birk and Jerry Carlson lived in Debtor's house in 2011. Debtor also testified that Jon Peltier stayed in the house from time to time. In addition, the Trustee offered evidence that Jon Peltier and Jerry Carlson gave Debtor checks on many occasions throughout 2011 that Debtor deposited in his personal bank account, suggesting that Debtor received rent from one or both of these men.

c.    Fraudulent Intent

The fourth element of the Trustee's section 727(a)(4) cause of action pertains to Debtor's intent.  See In re Freese, 460 B.R. at 738.  "Fraudulent intent may be established by circumstantial evidence."  In re Korte, 262 B.R. at 474.  The circumstances and the debtor's course of conduct may be essential in determining the debtor's subjective state of mind because of the improbability that the debtor will concede fraudulent intent.  In re Sears, 246 B.R. at 349-50.  Courts are often understanding of a single omission or error resulting from an innocent mistake, but multiple inaccuracies or falsehoods may rise to the level of reckless indifference to the truth. Kaler v. Geller (In re Geller), 314 B.R. 800, 807 (Bankr. D.N.D. 2004).  Statements made with reckless indifference to the truth are regarded as intentionally false. Id.; In re Korte, 262 B.R. at 474; In re Bren, 303 B.R. at 614-16.

Debtor's schedules and Statement of Financial Affairs contain multiple inaccuracies, including omitting and undervaluing assets.  Debtor omitted his mineral interests, tools and

---

In response to this evidence, Debtor explained that he deposited Jon Peltier's and Jerry Carlson's paychecks and then wrote a check to "cash" or himself for roughly the same sum as the paychecks and gave the money to the man whose check he cashed. Debtor testified that he did not receive rent from either Jeff Peltier or Jerry Carlson until after he petitioned for bankruptcy relief.

Upon review of the bank statements received as evidence, it appears that the deposits from Big John's, Byers and Dirt Pro (entities for which Jon Peltier worked) loosely correspond with withdrawals from Debtor's bank account.  Likewise, deposit tickets referencing "Carlson" or Jerry Carlson's employer correspond with withdrawals from Debtor's personal checking account.  It also appears that the checks were not for a standard sum and were not cashed on a strict month-by-month schedule.  This evidence suggests that Debtor's explanation is plausible.  Although the Court is suspicious of Debtor's explanation that he performed this check-cashing function as a favor to Jon Peltier and Jerry Carlson who allegedly did not have bank accounts, without more evidence that the checks Debtor received were rent payments, the Court finds that the Trustee has not met his burden of proof on this allegation.

a new bed.  He undervalued the sum of cash on hand and the value of the accounts receivable due to B & B.  Most significantly, Debtor failed to disclose his transfers of real property to his mother, mineral interests to his former spouse, $1,200 in cash to his son and debt payments to his girlfriend and on behalf of his daughter.  The number and significance of these omissions and inaccuracies support the Trustee's argument that Debtor made them with reckless indifference to the truth.

Debtor's explanations for these omissions and inaccuracies do not mitigate his conduct or absolve him of the consequences of his actions.  For example, Debtor claims that he omitted his new bed and his used tools[15] on Schedule B because he thought these items were exempt.  Debtor's explanation for failing to list the bed is suspect given that item number 4 on Schedule B specifically requests debtors to list household goods and furnishings and Debtor obviously read the question because he listed other household goods on Schedule B. It appears more plausible that Debtor declined to list the new bed because he could not exempt it.  More importantly, the exempt status of an asset does not excuse Debtor from failing to disclose it on his schedules.  Phillips v. U.S. Trustee (In re Phillips), 2010 WL 6259975, at *4 (B.A.P. 9th Cir. Apr. 6, 2010) ("Exempt or not, the schedules required [debtor] to disclose all assets."); Moreo v. Rossi (In re Moreo), 437 B.R. 40, 66-67 (E.D.N.Y. 2010) (false oaths about assets of the estate, even if they are worthless or exempt, may be sufficient to warrant a denial of discharge).

_____

[15] Debtor also failed to list the monthly expense he incurred to store these used tools on Schedule J.  In response to questions regarding his omission of the monthly expense for the storage unit, Debtor explained that he believed it was unnecessary to list this expense.  Given that he listed other monthly expenses on Schedule J, this excuse is not credible.

28

Debtor also argues that he should be excused from the consequences of failing to list his used tools and to disclose an accurate value for the B & B accounts receivable on Schedule B because he gave information to his attorney about these items, but his attorney failed to list them on his schedules. The Court is not persuaded by this argument for two reasons. First, it is Debtor's duty to make complete and accurate disclosures on his petition, schedules and statements.[16] Second, Debtor's reliance on attorney error as a basis to mitigate intent to conceal assets in this case is misplaced because there is no evidence that he fully disclosed all his assets and gave all necessary information to his attorney or that Debtor complied with his duty to review his schedules and statements to ensure they were complete and accurate.[17]

---

[16] See In re Bren, 303 B.R. at 613-16 ("The proper functioning of the entire bankruptcy process is dependent upon debtors providing complete, accurate and reliable information in the petition and other documents submitted with the filing of the case so that parties in interest may evaluate debtors' assets and liabilities and appropriately administer the case.").

[17] See Palmer v. Downey (In re Downey), 242 B.R. 5, 15 (Bankr. D. Idaho 1999) ("[A]ttorney error does not absolve a debtor, who signs the petition and schedules under penalty of perjury, from the duty to ensure the information is accurate and complete to the best of his knowledge."); see also In re Tully, 818 F.2d 106, 111 (1st Cir. 1987) ("A debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath."); U.S. Trustee v. Killian (In re Killian), 2008 WL 5834017, at *4, *9 (Bankr. D. Or. Nov. 17, 2008) (rejecting debtors' defense that they gave their counsel all of the information necessary to complete bankruptcy documents and relied on counsel to include the information in these documents); In re Bauer, 291 B.R. 127, 130 (Bankr. D. Minn. 2003) (rejecting a "blame the lawyer" defense where debtors failed to take into account information readily available to them when completing their schedules and the attorney who allegedly made these mistakes was not called as a witness); Barnett Bank of Tampa v. Muscatell (In re Muscatell), 113 B.R. 72, 74-75 (Bankr. M.D. Fla. 1990) (rejecting debtor's argument that he failed to disclose assets on the advice of counsel because the advice related to plain and transparent facts.)

Similarly, evidence establishing that Debtor failed to disclose transfers to his mother, former spouse and son shows reckless disregard for the truth without a defense that would mitigate a finding of fraudulent intent. With regard to the transfers to his mother and former spouse, Debtor neither listed them in his Statement of Financial Affairs nor initially disclosed them at the meeting of creditors. Debtor disclosed them only after inquiry by Attorney Keogh. His initial explanation for failing to disclose these transfers was that he did not think about the transfers and did not consider them relevant.[18] At trial, Debtor testified he did not list them because he believed that he had no interest in the properties. He explained that his actions were merely to remove his name from their property.

Other evidence received at trial, including the quit claim deed and mineral deed he signed, shows that Debtor transferred all of his right, title and interest in a parcel of real estate to his mother and mineral interests to his former spouse. See Exhs. T-5, T-7. Additionally, Debtor conceded in the Amended Final Pretrial Statement that he transferred these property interests to his mother and former spouse. See ECF Doc. No. 57, at 3. Even if the Court assumes that Debtor did not intend to claim the minerals and real property as his own or to liquidate the property for his own benefit, this does not change the fact that he knowingly transferred his interest, yet failed to disclose it. The issue is not

---

[18] Debtor did not amend his Statement of Financial Affairs to include the transfers to his mother and former spouse, even though he disclosed them to the Trustee at the meeting of creditors and the Trustee informed him that they may have an impact on the bankruptcy estate. A debtor's duty of disclosure requires updating schedules as soon as reasonably practical after he or she becomes aware of any inaccuracies or omissions. See In re Bauer, 298 B.R. at 357. Therefore, Debtor had a duty to amend his schedules to include these transfers even if he disputed his interest in them or the value exchanged. Failing to amend schedules after becoming aware of their inaccuracy is additional indicia of a debtor's reckless indifference to the truth. See Kaler v. Danduran (In re Danduran), 2011 WL 3664436, at *13 (Bankr. D.N.D. Aug. 19, 2011).

whether Debtor felt he should or could exercise his ownership rights to the mineral interests he and his wife received from her family or the interest in real property his mother transferred to him and his siblings for estate-planning purposes.  The issue is whether he recklessly disregarded his duty to disclose transfers of his interest in real property and minerals.  The Court finds that he did.

As a defense to the Trustee's claim that Debtor fraudulently concealed the transfer of real property to his mother, Debtor also asserts that the interest he deeded to his mother had no value: "he received <u>nothing</u> and what he transferred was <u>nothing</u>."[19]  To the extent Debtor suggests that he does not have a duty to disclose an asset that he perceives has no value to the estate, the Court rejects this argument.[20]  All assets and transactions must be disclosed, even if the assets are worthless or unavailable to creditors.  <u>See</u> <u>United States v. Canine</u>, 2002 WL 417271, at *2 (8th Cir. Mar. 19, 2002); <u>Palatine Nat'l Bank of Palatine v. Olson</u> (<u>In re Olson</u>), 916 F.2d 481, 484 (8th Cir. 1990); <u>Larocco v. Smithers</u> (<u>In re Smithers</u>), 2006 WL 509396, at *4 (B.A.P. 6th Cir. Mar. 2, 2006); <u>In re Muscatell</u>, 113

---

[19] Debtor devotes the majority of his post-trial brief to defending the Trustee's section 548 cause of action.  Specifically, Debtor argues that he received nothing when his mother transferred an interest in real property to Debtor and Debtor received nothing when he transferred it back.  Consequently, he claims that there was an exchange of "reasonably equivalent value for the transfer of the property or obligation."  Because the Trustee obtained the remedy he sought with his section 548 cause of action through settlement, this claim is moot and the Court need not analyze this issue.

[20] Debtor raised a similar defense when asked about his failure to disclose that he owned used tools.  Despite conceding that his used tools were worth in excess of $1,000 in the Final Pretrial Statement and Amended Final Pretrial Statement, Debtor testified at trial that he did not list the used tools on Schedule B because they had little value.  This explanation is not a persuasive defense to a section 727(a)(4)(A) cause of action because disclosure of assets is required regardless of value.  <u>See</u> <u>Chalik v. Moorefield</u> (<u>In re Chalik</u>), 748 F.2d 616, 618 (11th Cir. 1984); <u>Fokkena v. Peterson</u> (<u>In re Peterson</u>), 356 B.R. 468, 478 (Bankr. N.D. Iowa 2006) (quoting <u>In re Kasden</u>, 209 B.R. 239, 243-44 (B.A.P. 8th Cir. 1997)).

B.R. at 74; see also Chalik v. Moorefield (In re Chalik), 748 F.2d 616, 618 (11th Cir. 1984)

("The recalcitrant debtor may not escape a section 727(a)(4)(A) denial of discharge by

asserting that the admittedly omitted or falsely stated information concerned a worthless

business relationship or holding; such a defense is specious."); Fokkena v. Peterson (In re

Peterson), 356 B.R. 468 (Bankr. N.D. Iowa 2006) (quoting Miller v. Kasden (In re Kasden),

209 B.R. 239, 243-44 (B.A.P. 8th Cir. 1997)) ("Debtor has asserted that several omissions

in his bankruptcy filings were de minimus or immaterial. However, debtors have an

'absolute duty to report whatever interests they hold in property, even if they believe their

assets are worthless.'").

In addition to the omission of transfers to his mother and former spouse, Debtor

failed to disclose a $1,200 cash transfer to his son within three weeks of filing his

bankruptcy petition.  Debtor did not list this transfer as a gift or as an "other transfer" on the

Statement of Financial Affairs.  He did not disclose the transfer when the Trustee asked

him about transfers to relatives or disposition of the 1990 International truck sale proceeds

at the meeting of creditors.   The Trustee was not aware of this transfer until Debtor

provided a list of how he spent the proceeds of the 1990 International truck, days after the

meeting of creditors.  See Exh. T-10.

In response to the Trustee's allegation that Debtor failed to disclose the cash

transfer to his son for his wedding, Debtor admitted that he gave his son the money, but

denied that the money was a gift.  Rather, he maintained that it was his obligation as a

parent to help his son with wedding expenses.  The evidence shows that this "obligation"

was not contractual, but rather Debtor's desire to help his son with wedding expenses.  As

32

Debtor explained in this post-trial brief: "Fathers are often wont to do those sort of things."
Br., ECF Doc. No. 65, at 5.

The Court does not question Debtor's desire to help his son with wedding expenses.
Even if the Court accepts Debtor's claim that it was his moral obligation to pay for part of
the wedding expenses, this fact does not excuse Debtor from disclosing the transfer.
Debtor offered no persuasive defense to knowingly omitting the cash transfer from his
Statement of Financial Affairs.  To the contrary, the fact that Debtor did not list the transfer
in his bankruptcy pleadings or disclose it at the meeting of creditors is indicative of intent
to conceal.

Likewise, Debtor failed to disclose that he paid a $673.77 car repair bill for his
daughter shortly before petitioning for bankruptcy relief.  Debtor asserts that he paid this
bill in the ordinary course of business, but his testimony is not consistent with this defense.
Although Debtor owns an interest in this vehicle, he testified that the 2004 Oldsmobile was
his daughter's car, but she could not afford to pay the repair bill so he paid it for her.  He
has not offered evidence sufficient to show that this bill was paid in the ordinary course of
his business.

Even if Debtor had shown that he paid the car repair bill in the ordinary course of his
business, this evidence would not have supported his defense against the Trustee's claim.
Debtor had a duty to disclose all payments to creditors for services made within 90 days
prior to commencing his bankruptcy case.  See Statement of Financial Affairs, No. 3, ECF
Doc. 1, at 36.  Debtor paid the car repair bill a month before he filed his bankruptcy petition,
but did not report the payment in response to the question requesting a list of payments to
creditors.  The payment of the car repair bill was either a gift to his daughter or a payment

33

to a creditor.  Either way, Debtor failed to disclose this payment.  Accordingly, the Court finds that Debtor omitted this information from his schedules and statements with reckless disregard for the truth.

In addition, Debtor's Statement of Financial Affairs does not include payments he made to his girlfriend for living expenses.  During the meeting of creditors, Debtor testified that he considered his girlfriend, Teresa Rohwedder, to be one of his creditors because he lived with Rohwedder in her condominium and she asked that he pay $349 per month for rent.  He did not list Rohwedder as a creditor on his schedules, however.  At trial, Debtor admitted that he did not consistently make these payments and that he had missed payments in the months prior to filing his bankruptcy petition.  Debtor gave some of the proceeds from the February 1, 2012, sale of the 1990 International truck to Rohwedder. His representations regarding the exact sum of money he transferred to her are not consistent.  During the meeting of creditors, Debtor testified he used at least $2,000 or $3,000 of the sale proceeds to pay Rohwedder.  In the sale proceeds itemization letter he prepared and sent to his attorney, Debtor represented that he gave Rohwedder only $700. See Exh. T-10.  Regardless of the sum, Debtor's failure to disclose the cash transfer to Rohwedder as a payment to a creditor or other transfer on his Statement of Financial Affairs was made with reckless disregard for the truth.

Debtor's failure to accurately list the value of accounts receivable also raises concerns regarding Debtor's intent to conceal assets.  During the meeting of creditors, Debtor testified that the $250 listed next to "accounts receivable" on Schedule B was the debt owed on only one account.  When questioned at trial about accounts receivable, Debtor admitted that three or four different customers owed B & B money on the date he

34

filed his petition and that the amount recorded next to accounts receivable on Schedule B was not accurate.

Bank statements received into evidence show that not less than $937.45 was deposited into the B & B checking account from four different customers for services Debtor conceded were performed by B & B in January 2012.  These deposits were all made after Debtor filed his petition but prior to the date he filed his amended Schedule B on April 26, 2012.  Debtor did not amend the accounts receivable total to reflect a more accurate amount, despite receiving payments on these accounts before amending his schedules. Nevertheless, he amended his schedules to reflect a debt owed by an entirely different customer.  In his amended Schedule B, Debtor listed a credit of $1,300 owed by George's Tire as "other liquidated debt owed to debtor."  Debtor explained that George's Tire was one of the three or four customers he believed owed funds to B & B on the date he petitioned for bankruptcy relief.  He offered no credible explanation for failing to disclose the other customers who paid for services performed by B & B or for failing to disclose the judgment creditor who paid $1,000 to B & B in August 2012.  It is apparent that debtor did not thoroughly review B & B accounts receivable before recording the amount on Schedule B.  His representation that the accounts receivable amount was approximately $250 was made with reckless disregard for the truth.

In addition, the Court finds that Debtor knowingly and intentionally undervalued the sum of "cash on hand" on Schedule B by representing that he possessed only $3 on the date he filed his bankruptcy petition.  See Exh. T-1.  Debtor initially testified that he had no other cash on the date he filed.  When the Trustee asked Debtor about the $500 he deposited into his personal checking account five days after filing his petition, he

speculated that the funds came from B & B's checking account or from his girlfriend.  He later admitted that he had not spent all of the proceeds from the sale of the 1990 International truck and that the $500 deposit came from this sale.  Debtor acknowledged at trial that he possessed $500 at the time he petitioned for bankruptcy relief.

The Court is also troubled by Debtor's misrepresentation of the amount of cash on hand at the meeting of creditors on March 23, 2012.  When the Trustee asked Debtor about the disposition of the sale proceeds, Debtor failed to mention there was $500 remaining at the time he petitioned.  In the written itemization of the disposition of sale proceeds Debtor prepared for his attorney on April 2, 2012, shortly after the meeting of creditors, he inferred that all the sale proceeds were spent before he filed for bankruptcy relief.  See Exh. T-10. The itemization does not say or suggest that Debtor possessed some of the proceeds when he filed his bankruptcy petition.  The fact that Debtor deposited the $500 into his account between the time he petitioned for bankruptcy relief and the meeting of creditors raises further concerns regarding his intent to conceal this money.  Likewise, Debtor's failure to correct the sum of cash on hand when he amended his schedules on April 26, 2012, is additional indicia of his reckless indifference to the truth.  See Exh. T-2; Kaler v. Danduran (In re Danduran), 2011 WL 3664436, at *13 (Bankr. D.N.D. Aug. 19, 2011) (finding that failure to amend schedules after becoming aware of their inaccuracy is additional indicia of a debtor's reckless indifference to the truth).

In summary, the Trustee has met his burden of proving the fourth element of his section 727(a)(4)(A) cause of action.  The Court finds that Debtor omitted assets and transfers from his schedules and Statement of Financial Affairs with reckless disregard for the truth.

d.    Material To Debtor's Bankruptcy Case

The last element the Trustee must prove under section 727(a)(4)(A) is materiality.

See In re Freese, 460 B.R. at 738.  For a false oath or account to bar a discharge, the false

statement must be material.  In re Freese, 460 B.R. at 738.  The threshold for materiality

is fairly low.  In re Charles, 474 B.R. at 686.  "The subject matter of a false oath is 'material'

and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business

transactions or estate, or concerns the discovery of assets, business dealings, or the

existence and disposition of his property."  Id.; In re Korte, 262 B.R. at 474; In re Sears, 246

B.R. at 347.   The value of omitted assets, although relevant to materiality, is not

determinative.  In re Sears, 246 B.R. at 347.

Debtor's inaccurate estimate of accounts receivable and cash on hand, his transfer

of cash to his girlfriend and son, and the payment of a car repair bill for his daughter are

material because they concern the existence and disposition of his property. This money

could have been used to pay unsecured creditors.  The failure to disclose the transfer of

mineral interests to his former spouse and his interest in real estate to his mother likewise

bears a relationship to Debtor's estate, assets and the disposition of his property.

Debtor asserts that some of the assets he failed to disclose are exempt and

suggests that they are not material under section 727(a)(4)(A).  The fact that Debtor may

exempt a particular asset does not render an omission or falsity immaterial.  See Mertz v.

Roff, 955 F.2d 596, 598 (8th Cir. 2002) (nondisclosure of $1,358 exempt tax refund was

material because it was an asset of the estate and therefore bore a relationship to the

estate).

37

Additionally, the Court rejects Debtor's argument that failure to disclose his used tools and the transfer of real property to his mother are not material because he received no consideration for the transfer of real property and the tools are not worth much.  While the value of omitted assets is relevant to materiality, the materiality analysis does not turn on value.  In re Sears, 246 B.R. at 347.  "An omission of a relatively modest asset will merit denial of discharge, if done with knowledge and fraudulent intent." Id.  Debtors are required to disclose their assets and transactions and leave it to the trustee or creditors to determine their impact on the estates.  Fokkena v. Rohde (In re Rohde), 400 B.R. 230, 235 (Bankr. N.D. Iowa 2009).  The Court finds that both the real property transferred to his mother and the tools he omitted from his schedules related to his business transactions, bankruptcy estate and assets.   Accordingly, the Court finds that Debtor's false statements were material.

Reviewing all of the evidence, the Court concludes that the multiple omissions and undervaluation of assets on Debtor's schedules and inaccurate answers on his Statement of Financial Affairs rise to the level of reckless indifference to the truth.  The statements and omissions related materially to Debtor's bankruptcy case.

For these reasons, the Court concludes that Debtor knowingly and fraudulently made false oaths in connection with this case. The Trustee met his burden of proof under section 727(a)(4)(A), warranting a denial of discharge.

2.    11 U.S.C. § 727(a)(2)(A)

Section 727(a)(2)(A) provides a debtor is barred from entry of discharge if "the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under [the Bankruptcy Code], has transferred, removed,

38

destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed . . . property of the debtor, within one year before the date of the filing of the petition[.]" 11 U.S.C. § 727(a)(2)(A).  Given the Court's determination that Debtor's discharge is denied under section 727(a)(4)(A), it is not necessary to reach the question of whether his discharge should also be denied under section 727(a)(2)(A).

The Court has considered all other arguments and deems them to be without merit.

## IV.   CONCLUSION

For the reasons stated above, **IT IS ORDERED** that:

1. Count I of the Trustee's Amended Complaint is DISMISSED.  In light of the denial of discharge under 11 U.S.C. § 727(a)(4), it is not necessary for the Court to decide whether the Trustee is also entitled to denial of discharge under 11 U.S.C. § 727(a)(2)(A).

2. Judgment shall be entered in favor of the Trustee and against Debtor on Count II of the Trustee's Amended Complaint.  Debtor's discharge is **DENIED** pursuant to 11 U.S.C. § 727(a)(4).

3. (A)  In Count III of his Amended Complaint, the Trustee sought to recover "the property transferred, or the value of the property from the initial transferees, Pauline Berger and Shirlene Berger" pursuant to 11 U.S.C. §§ 548 and 550.  In Count IV of his Amended Complaint, the Trustee alleged that Debtor made transfers to Pauline Berger and Shirlene Berger that allowed them to receive more than they would have received if the transfers had not been made.  In his prayer for relief, the Trustee sought an order awarding the estate the interest transferred pursuant to 11 U.S.C. § 547.

Shirlene Berger and the Trustee reached a compromise and filed a Settlement Agreement on January 25, 2013. The Court approved this agreement on February 22, 2013. Pursuant to the terms of this agreement, the Trustee agreed to dismiss Shirlene Berger as a defendant in this adversary proceeding. On July 11, 2013, the Trustee filed a Stipulation for Dismissal of Shirlene Berger and Pauline Berger. Accordingly, the causes of action alleged in Count III and Count IV against Shirlene Berger are DISMISSED.

(B)  In Count III of his Amended Complaint, the Trustee sought to recover "the property transferred, or the value of the property from the initial transferees, Pauline Berger and Shirlene Berger" pursuant to 11 U.S.C. §§ 548 and 550. In Count IV of his Amended Complaint, the Trustee alleged that Debtor made transfers to Pauline Berger and Shirlene Berger that allowed them to receive more than they would have received if the transfers had not been made. In his prayer for relief, the Trustee sought an order awarding the estate the interest transferred pursuant to 11 U.S.C. § 547. Pauline Berger and the Trustee reached a compromise and filed a Settlement Agreement on April 4, 2013. The Court approved this agreement on May 3, 2013. Pursuant to the terms of this agreement, the Trustee agreed to accept the sum of $25,000 to completely and fully settle the estate's claim against Pauline Berger. On July 11, 2013, the Trustee filed a Stipulation for Dismissal of Shirlene Berger and Pauline Berger. Accordingly,

the causes of action alleged in Count III and Count IV against Pauline Berger are DISMISSED.

(C) The Trustee obtained the remedy he sought in Count III and Count IV through settlement agreements with Shirlene Berger and Pauline Berger. Therefore, the Trustee's causes of action against Debtor in Count III and Count IV are DISMISSED AS MOOT.

Judgment may be entered accordingly.

Dated this 29th day of July, 2013.

Shon Hastings, Judge
United States Bankruptcy Court

41